PREST-O-LITE CO., Inc., v. ACETYLENE WELDING CO. et al.

(District Court, D. New Jersey. August 8, 1916.)

1. TRADE-MARKS AND TRADE-NAMES ☞97—UNFAIR COMPETITION.
   The managing officers of a corporation, who used it as a means for unfair competition, may be enjoined from such acts.
2. TRADE-MARKS AND TRADE-NAMES ☞89—UNFAIR COMPETITION—CORPORATION.
   The managing officer of a corporation, who used the corporation as a cloak for unfair competition and to escape personal liability, and received profits from such unfair methods, is, where the corporation is a mere shell, and incapable of responding in damages, liable for the unfair competition, and bound to account for profits made.
3. TRADE-MARKS AND TRADE-NAMES ☞98—UNFAIR COMPETITION—ACCOUNTING.
   Where the managing officers of a corporation asserted that their course of unfair competition did not result in any profits, but there was no demon-

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

strable evidence, as books, offered to sustain that claim, complainant is entitled to an accounting, if it desires the same, to determine the question of profits, but must bear the expense of an accounting, if it is not established on reference that profits were realized.

In Equity. Suit by the Prest-O-Lite Company, Incorporated, against the Acetylene Welding Company, Leonard Lorentowitz, and John Lorentowitz. On final hearing. Decree for complainant.

Keyes Winter, of New York City, for plaintiff.

William Greenfield, of Newark, N. J., for defendants.

HAIGHT, District Judge. The evidence conclusively establishes that the defendant Acetylene Welding Company, for a considerable period of time before and after the filing of the bill in this case, was engaged in the practices which have heretofore been held by this court, in Prest-O-Lite Co. v. Bournonville, 260 Fed. 440, 442, 446, to constitute an infringement of plaintiff's trade-mark, as well as unfair competition. The plaintiff, as against that defendant, is therefore clearly entitled to an injunction as broad as that which was preliminarily granted in this case. But I am now convinced that the mere removing of the name "Prest-O-Lite" from tanks will not completely prevent deception on the purchasing public, to whom the appearance of the tank is often the controlling guide. Hence I think that, in addition to the other precautions required to be taken to prevent deception, and which are mentioned in the preliminary injunction, the defendant must be required, before offering for resale any Prest-O-Lite tanks, which have been refilled by it, to paint them a different color than plaintiff uses. The plaintiff is also entitled to all damages which it has suffered by reason of the Acetylene Welding Company's unlawful acts, and to an accounting of any profits which the latter has realized therefrom. Indeed that the plaintiff is entitled to such relief is not seriously disputed.

[1, 2] The important question is whether it is entitled to any relief against the two individual defendants. They were directors and officers of the defendant corporation during the time the unlawful acts were done. To understand their connection with the company, the extent of their participation in the unlawful acts, and thus to determine whether any relief may be afforded the plaintiff against them, it is necessary to consider the circumstances under which the company was incorporated and what transpired before. Prior to February, 1912, Camille Bournonville and his wife, Ida, began the business of refilling tanks which had been manufactured and placed upon the market by the plaintiff. A suit was thereupon instituted in this court against them by the plaintiff, alleging that in doing so they were infringing certain patents of which the plaintiff was the licensee, and a preliminary injunction was granted therein. In February of the following year that injunction was dissolved, because of a decision of another court that the patents, upon which the suit was based, had expired. Shortly after the injunction was dissolved, the place of business in which the Bournonvilles had been carrying on their business was destroyed by an explosion. They then began the

erection of a new plant, and, being in need of capital to complete it, they induced the defendant Leonard Lorentowitz to invest some money in the business. This he did to the extent of $2,500. The other Lorentowitz, who is a son of Leonard Lorentowitz, invested nothing.

Before the corporation was formed, and on July 1, 1913, a suit was instituted against the Bournonvilles to restrain them from refilling tanks originally placed upon the market by the plaintiff, without in all cases removing from such tanks the word "Prest-O-Lite" wherever it appeared thereon, and on July 18th, a preliminary injunction was granted by this court to that effect. On July 20th the defendant corporation was formed. The incorporators were the two Bournonvilles and the two Lorentowitzes. One-half of the capital stock was divided equally between the Bournonvilles, and the remaining one-half between the Lorentowitzes; the son apparently taking only one share to qualify him as a director. The directors were the incorporators. Camille Bournonville was the president and general manager. Leonard Lorentowitz was the treasurer and signed all checks, and John Lorentowitz was the secretary. The company carried on business under this management and with these officers and directors until the month of September, 1914, when a final decree was entered in the suit pending in this court against the Bournonvilles, adjudging that the refilling of tanks originally placed upon the market by the plaintiff, without removing the name "Prest-O-Lite" therefrom, was unlawful. Shortly thereafter Camille Bournonville retired from active participation in the business, and in April of the following year his stock, as well as that of his wife, was purchased by Leonard Lorentowitz. During all of the period of time in which Bournonville was in control, the defendant was undoubtedly doing the acts which the preliminary injunction forbade the Bournonvilles to do. In addition there was maintained at the side of the plant a large sign, on which the word "Prest-O-Lite" was conspicuous, announcing that "Prest-O-Lite tanks" were there exchanged.

According to the testimony of Lorentowitz the elder, as well as his son, from the time Bournonville left until January, 1915, a daughter of Lorentowitz was in charge at the plant and very little business was done. Undoubtedly during this latter period Leonard Lorentowitz was in sole and active control of the business. It is true that he testifies that he took very little interest in it; that he gave instructions that it was to be conducted in strict compliance with the decree in the Bournonville suit, and supposed that they were being carried out. Yet the evidence leaves no doubt in my mind that during that time considerable business was done; that a great majority, if not all of the tanks which were refilled and sold, did not have the name "Prest-O-Lite" removed therefrom; that the before-mentioned sign was retained; and that all of this was done with the consent and knowledge of Leonard Lorentowitz. He admits that he daily visited the plant, and it is inconceivable that, with only his daughter in charge, he did not know what was going on. I think that he felt secure under the delusion that he could shield himself under the cov-

er of the corporation. In January he placed a man named Schubert in charge of the business, and thereafter it was conducted, up to and subsequent to the filing of the bill of complaint in this case, in the same manner as theretofore.

During this latter period of time, also, I have no reasonable doubt that Leonard Lorentowitz knew what was being done and was an active participant therein. He then was the only person having any financial interest in the concern, who was taking an active part in the management thereof. The corporation's acts were his acts, and whatever benefit, if any, was derived therefrom would and did inure to him. It also appears that the corporation is now nothing but an abandoned shell, incapable of being made to respond for damages or to account for profits. Under these circumstances the rule is firmly established that a director or officer of a corporation is liable, equally with the corporation, for damages to one injured by the latter's acts of infringement, and to account for profits which he has actually received. National Cash Register Co. v. Leland, 94 Fed. 502, 507, et seq., 37 C. C. A. 372 (C. C. A. 1st Cir.); Cahoone Barnet Mfg. Co. v. Rubber & Celluloid Harness Co., 45 Fed. 582 (C. C. N. J.); Saxlehner v. Eisner, 140 Fed. 938 (C. C. S. D. N. Y.); Howard v. St. Paul Plow Works, 35 Fed. 743 (C. C. Minn.); Smith v. Standard Laundry Machinery Co., 19 Fed. 826 (C. C. S. D. N. Y.); Peters v. Union Biscuit Co., 120 Fed. 679, 686 (C. C. E. D. Mo.). See, also, Belknap v. Schild, 161 U. S. 15, 16 Sup. Ct. 443, 40 L. Ed. 599; Clark Thread Co. v. William Clark Co., 55 N. J. Eq. 658, 37 Atl. 599. The above authorities are cited as merely representative and by no means intended to be comprehensive.

[3] The plaintiff is therefore entitled to the same perpetual injunction against Leonard Lorentowitz as it is against the Acetylene Welding Company, and to recover from him any damage which it suffered by reason of the acts of the corporation, after Bournonville retired from the management of the business. During the time that Bournonville was in control, I am not satisfied that Leonard Lorentowitz had such a personal participation in the conduct of the business as to make him liable to respond in damages to the plaintiff; but if, during that time, he received any profits by reason of the unlawful acts of the corporation, I can conceive of no reason why he should not be required to account for them. They would be the result of an invasion of plaintiff's property rights, and Lorentowitz cannot, in justice and equity, have a greater right to them than the corporation which earned them, and through which he, as one of the members of the corporate body, received them. There can be no doubt of his liability to respond for any profits which he received during the time that the business was under his control. It is true that he testifies, as does his son and Bournonville, that no profits were realized. Of course, if such is the case, an accounting would be a useless formality and an unnecessary burden to place upon that defendant; however, as I stated during the trial, in the absence of any books or means at hand whereby the plaintiff could at that time refute their testimony in this respect, I feel that an accounting should

be ordered if the plaintiff desires it, so that the latter may there have the opportunity of establishing, if possible, that any profits were realized. If, however, on such an accounting, it is not established that Leonard Lorentowitz received profits, the cost of the reference must be borne by the plaintiff.

I do not attempt to decide definitely at this time whether Lorentowitz can be held to account for profits which the corporation realized, but which he did not actually and personally receive, because that question has not been argued in this case, but, I understand, is to be argued before me shortly in the Bournonville Case. I see no impropriety, however, in stating that, on my present information, I cannot understand how one can be charged with profits, as distinguished from damages, which he did not receive, and such, I think, is the authoritative rule. Belknap v. Schild, supra; Clark Thread Co. v. William Clark Co., supra. I cannot find that John Lorentowitz took any such part in the operation of the business as to make him responsible for the corporation's act. There is, it is true, evidence which would connect him with certain isolated transactions, and which might make him responsible to that extent as an infringer of the plaintiff's trade-mark; but, upon the whole, I do not think the plaintiff had sustained the burden of establishing that his connection with the business or his acts were such as to make him responsible in damages, certainly not to account for any profits.

A decree will be signed in accordance with these conclusions.